IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 4:14-cr-00141-GHD-SAA-1, -15

FRANK GEORGE OWENS, JR. a/k/a
State Raised and ERIC GLENN PARKER                                                    DEFENDANTS

**MEMORANDUM OPINION DENYING DEFENDANTS'
MOTIONS FOR RECONSIDERATION OF THEIR REQUESTS FOR ACQUITTAL, OR
ALTERNATIVELY, MOTIONS FOR NEW TRIAL**

Presently before the Court are the motion for reconsideration of request for acquittal, or
alternatively, motion for new trial [557] filed by Defendant Eric Glenn Parker ("Parker") and the
motion for reconsideration of request for acquittal, or alternatively, motion for new trial [558]
filed by Defendant Frank George Owens, Jr. ("Owens"). After an approximately seven-day trial,
the jury found Parker and Owens guilty of all charged offenses relating to their involvement in
the gang the Aryan Brotherhood of Mississippi (the "ABM"). Making many overlapping
arguments, Parker and Owens contend the following: (1) the evidence at trial was insufficient to
establish their guilt; (2) the jury verdicts were against the overwhelming weight of the evidence;
(3) their respective motions for mistrial should have been granted; (4) the Court improperly
allowed the Government to take photographs of Parker and Owens and submit them to the jury;
and (5) the Court erred in admitting a great deal of evidence at trial. In addition, Parker argues
the following: (1) venue was not proper in the Northern District of Mississippi; (2) the Court
should have granted all jury instructions offered by him; (3) his trial should have been severed
from the trial of Owens, who was also found guilty; and (4) the Court should have granted his
motion for expedited psychological evaluation and not required him to go to trial without

1

additional time to prepare his defense. Upon due consideration of the motions, the Government's responses in opposition, Parker's reply to his particular motion, the entire record herein, and the applicable law, the Court finds that the motions must be denied for the following reasons.

## I. Background

This case has encompassed as many as seventeen defendants charged with offenses related to their involvement in the ABM. All pled guilty except the two defendants who elected to proceed to trial, Parker and Owens. On April 23, 2015, a superseding indictment [203] charged Parker in Counts 1, 2, and 4 with conspiracy to participate in racketeering activity with the ABM in violation of the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d); one count of conspiracy to possess with intent to distribute methamphetamine ("meth"), 21 U.S.C. § 846; and one count of Murder in Aid of Racketeering ("VICAR murder"), 18 U.S.C. §§ 1959(a)(1) and (2). The superseding indictment [203] charged Owens in Counts 1, 3, 4, and 7 with conspiracy to participate in racketeering activity with the ABM in violation of the RICO Act, 18 U.S.C. § 1962(d); one count of Kidnapping in Aid of Racketeering, 18 U.S.C. §§ 1959(a)(1) and (2); one count of VICAR murder, 18 U.S.C. §§ 1959(a)(1) and (2); and one count of Attempted Murder in Aid of Racketeering, 18 U.S.C. §§ 1959(a)(5) and 2.

The trial in the case sub judice lasted from April 4, 2016 until April 13, 2016. Presentation of evidence lasted approximately seven court days, and the jury deliberated for approximately one full day. The Government called twenty-seven witnesses and introduced fifty-two exhibits. Among the Government's evidence were audio recordings of wiretapped calls among ABM members, copies of the ABM Constitution, boxes of meth, and photographs of

Owens' and Parker's ABM tattoos. The jury returned verdicts of guilty as to both defendants on all counts charged. *See* Jury Verdict as to Owens [551]; Jury Verdict as to Parker [552].

Parker and Owens filed timely renewed motions for judgment of acquittal, *see* Fed. R. Crim. P. 29(c)(1), and for a new trial, *see* Fed. R. Crim. P. 33(b)(2). In addition to their evidentiary challenges, Parker and Owens "renew" their previous motions, objections to evidence, and jury instructions made pretrial, during trial, and during the jury instruction conference.

## II. Legal Standards

### A. Motion for a Judgment of Acquittal

Rule 29 of the Federal Rules of Criminal Procedure provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A court "do[es] not weigh evidence or assess the credibility of witnesses, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Ramos–Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008); *see United States v. Johnson*, 381 F.3d 506, 508 (5th Cir. 2004) (citing *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992), *cert. denied*, 507 U.S. 943, 113 S. Ct. 1346, 122 L. Ed. 2d 728 (1993) ("Determining the weight and credibility of the evidence is within the exclusive province of the jury.")). The jury verdict will be upheld if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008). A court "views the evidence in the light most favorable to the verdict and draws all reasonable inferences from the evidence to support the verdict." *Percel*, 553 F.3d at 910 (internal quotation marks and citation omitted).

## B. Motion for a New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(b). "In th[e Fifth] Circuit, the generally accepted standard is that a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.' " *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)). " 'A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant.' " *Id.* (quoting *Wall*, 389 F.3d at 466). Accordingly, "harmless error," which is defined as "[a]ny error, defect, irregularity or variance which does not affect substantial rights," Fed. R. Crim. P. 52(a), does not warrant a new trial. *United States v. Akpan*, 407 F.3d 360, 369–70 (5th Cir. 2005).

## III. Discussion and Analysis

The Court addresses the issues presented in Parker's and Owens' motions as follows: (1) the defendants' shared arguments on the sufficiency of the evidence to support the guilty verdicts; (2) Parker's renewal of pretrial motions on venue, severance, and psychological evaluation; (3) the defendants' evidentiary objections; (4) the defendants' shared argument on their motions for mistrial; and (5) any other matters not already resolved in the discussion of the foregoing.

## A. Sufficiency of the Evidence

When examining the sufficiency of the evidence underlying a conviction, this Court is "highly deferential to the verdict." *See United States v. Herrera*, 466 F. App'x 409, 414 (5th Cir. 2012) (per curiam) (quoting *United States v. Moreno–Gonzalez*, 662 F.3d 369, 372 (5th Cir.

2011) (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002) (internal quotation marks omitted))). The Court considers "whether any rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *See id.* (quoting *United States v. Valdez*, 453 F.3d 252, 256 (5th Cir. 2006) (internal quotation marks omitted)). " 'It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt.' " *Id.* (quoting *Valdez*, 453 F.3d at 256) (quoting *United States v. Pruneda–Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992)). The question is thus whether the jury's verdict was reasonable—not whether it was correct. *Id.* (citing *Moreno–Gonzalez*, 662 F.3d at 372) (citing *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)). "A defendant may be convicted on the uncorroborated testimony of a co-conspirator who has accepted a plea bargain unless the co-conspirator's testimony is incredible." *United States v. Booker*, 334 F.3d 406, 410 (5th Cir. 2003) (citing *United States v. Villegas–Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999)). "Testimony is incredible as a matter of law only if 'it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.' " *Id.* (quoting *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994)).

In sum, the Court must view the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, and resolve all inferences and credibility assessments in favor of the verdict. *See id.*; *United States v. Ortiz*, 942 F.2d 903, 908 (5th Cir. 1991) (citing *United States v. Singh*, 922 F.2d 1169, 1173 (5th Cir. 1991)). Based on the foregoing standard, the Court finds that any rational trier of fact could have found that Parker and Owens guilty of the counts charged.

## 1. RICO Conspiracy (Parker and Owens)

Count 1 of the superseding indictment charged Parker, Owens, and other named and unnamed ABM members with RICO conspiracy arising from their membership in the ABM and participation in gang-related activities. *See* Superseding Indictment [203] ¶¶ 1–8. Specifically, the superseding indictment charged that Parker, Owens, and others conspired to participate in racketeering activity in violation of 18 U.S.C. § 1962(d) as part of the ABM, "a criminal organization whose members and associates engaged in narcotics distribution, firearms trafficking, money laundering, and acts of violence involving murder, attempted murder, assault, and kidnapping, and which operated throughout Mississippi, including the Northern District of Mississippi and elsewhere." *Id.* ¶ 1. Both Parker and Owens argue—without reasoning or authorities in support—that there was insufficient evidence to convict them and that the jury verdict was against the overwhelming weight of the evidence as to Count 1. Parker's Mot. [557] ¶¶ 7, 10; Owens' Mot. [558] ¶¶ 2, 6. In response, the Government contends that the evidence clearly supported the jury's verdict on Count 1. Gov't's Resp. Opp'n [561] at 18; Gov't's Resp. Opp'n [562] at 16–17 (citing evidence introduced at trial through testimony and exhibits).

Parker and Owens were charged with and convicted of RICO conspiracy under 18 U.S.C. § 1962(d), which criminalizes conspiracy to violate the RICO statute, 18 U.S.C. § 1962(c). The RICO statute provides that it is unlawful for anyone "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *See* 18 U.S.C. §§ 1962(c)–(d). A "pattern of racketeering activity . . . requires at least two acts of racketeering activity" no more than ten years apart. 18 U.S.C. § 1961(5). " '[R]acketeering activity' is defined to include a

number of so-called predicate acts." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 6, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010). Racketeering activity includes, as relevant in the case sub judice, "any act or threat involving murder, kidnapping, . . . dealing in a controlled substance or listed chemical . . . ." *See* 18 U.S.C. § 1961(1)(A).

Importantly, to convict a defendant of RICO conspiracy, the conspirator "need not have committed or agreed to commit the two predicate acts." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005); *see Herrera*, 466 F. App'x at 420 (contrasting a § 1962(d) conviction with a § 1962(c) conviction, "which requires a showing of two predicate acts constituting a 'pattern of racketeering activity' "); *Salinas v. United States*, 522 U.S. 52, 63, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997) (RICO conspiracy conviction requires no overt act or specific act).

"A defendant need not know exactly what predicate acts the conspiracy intends to perpetrate so long as the defendant knows and agrees to facilitate the 'overall objective' of the conspiracy." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239 n.17 (5th Cir. 2010); *see Salinas*, 522 U.S. at 63, 118 S. Ct. 469 ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."); *Pinkerton v. United States*, 328 U.S. 640, 646, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946) ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward"). "A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas*, 522 U.S. at 64, 118 S. Ct. 469 (citing *United States v. Rabinowich*, 238 U.S. 78, 86, 35 S. Ct. 682, 59 L. Ed. 1211 (1915)).

" 'The elements of a conspiracy under § 1962(d) are simply (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the <u>overall objective</u> of the RICO offense.' " *United States v. Rosenthal*, 805 F.3d 523, 530 (5th

Cir. 2015) (quoting *United States v. Pratt*, 728 F.3d 463, 477 (5th Cir. 2013) (emphasis added)). "The government may establish these elements with circumstantial evidence." *Herrera*, 466 F. App'x at 420 (citing *Delgado*, 401 F.3d at 296).

The evidence overwhelmingly supported the jury verdict on RICO conspiracy against both Parker and Owens.

First, the evidence clearly demonstrated, as the Fifth Circuit has upheld on appeal in another case, that the ABM "was a racketeering enterprise . . . bound together by a formal constitution and bylaws establishing a hierarchy and strict chain of command." *See United States v. Harlow*, 547 F. App'x 546, 548 (5th Cir. 2013) (per curiam). Witness testimony and numerous recorded conversations established the organization and structure of the ABM, as follows.

The Aryan Brotherhood originated in California in about 1967 and now operates throughout the entire United States. *E.g.*, 04/05/2016 Trial Tr. 68:25–25, 69:1–4 (Stephen Hubanks' testimony); 04/06/2016 Trial Tr. 216:11–17 (Perry Mask's testimony). The ABM was a prison gang established in the mid-1980s within the Mississippi Department of Corrections, but over time expanded to include rural and suburban areas of Mississippi and both prison and free world members. *E.g.*, 04/05/2016 Trial Tr. 69:5–15 (Hubanks' testimony); 04/06/2016 Trial Tr. 209:16–18, 216:18–20 (Mask's testimony). The ABM modeled itself on the Aryan Brotherhood of California and Texas. *E.g.*, 04/05/2016 Trial Tr. 69:13–17 (Hubanks' testimony); 04/06/2016 Trial Tr. 216:2–22 (Mask's testimony).

Both Dwayne Smith and Don Douglas, former supervisor and special agent of the Oxford, Mississippi Drug Enforcement Administration, respectively, who each have twenty-five years of experience investigating criminal gang activity, testified that the ABM was a white-

based prison gang involved in drug trafficking, money laundering, firearm trafficking, and acts of violence. 04/05/2016 Trial Tr. 11:5–11, 18–19; 16:18–22 (Smith's testimony); 04/05/2016 Trial Tr. 165:5–9 (Douglas' testimony). Former ABM leaders who pled guilty confirmed the ABM's organized criminal activity and presence all over the State of Mississippi, particularly with respect to meth distribution. *E.g.*, 04/05/2016 Trial Tr. 56:10–16, 66:5–8 (Hubanks' testimony); 04/06/2016 Trial Tr. 213:21–25, 214:1–8 (Mask's testimony); 04/07/2016 Trial Tr. 519:10–12 (James Dean's testimony), 04/08/2016 Trial Tr. 666:5–23 (Mitchell Valentine's testimony); 04/08/2016 Trial Tr. 720:10–14 (Brandon Creel's testimony).

The ABM was an ongoing organization in 2009, the beginning date of the RICO conspiracy charged in Count 1, and pursued unification with the Aryan Brotherhood of California in 2013. *E.g.*, 04/05/2016 Trial Tr. 85:19–25, 86:1–6 (Hubanks' testimony); *id.* 165:10–17 (Douglas' testimony); 04/06/2016 Trial Tr. 209:10–13, 229:4–8 19–20 (Mask's testimony); 04/08/2016 Trial Tr. 663:25, 664:1–10 (Valentine's testimony); 04/08/2016 Trial Tr. 724:12–15 (Creel's testimony); 04/11/2016 Trial Tr. 788:8–11, 805:10–20 (Thomas Parker's testimony). The ABM was governed by a written constitution that formed the basis of the ABM structure and included a detailed statement of the organization and its rules of conduct and membership requirements; the constitution was distributed statewide to anyone who held rank within the ABM. *E.g.*, 04/05/2016 Trial Tr. 70:2–7 12–21 (Hubanks' testimony); 04/06/2016 Trial Tr. 210:13–15 22–25; 211:1–15 (Mask's testimony); 04/07/2016 Trial Tr. 530:22–247 (Dean's testimony); 04/08/2016 Trial Tr. 728:10–18 (Creel's testimony). ABM membership was signified by a certain tattoo or "brand" representing the State of Mississippi; advancement in the ABM to the role of an enforcer was signified by additional tattoos, including thunderbolts representing thunder warrior status for commission of three confirmed violent missions.

9

04/05/2016 Trial Tr. 76:16–23, 77:2–25, 78:1–19 (Hubanks' testimony); 04/06/2016 Trial Tr. 206:16–19 22–25, 207:1–6, 223:12–25, 224:1–20 (Mask's testimony); 04/06/2016 Trial Tr. 334:1–6 (Jeremy Bailey's testimony); 04/06/2016 Trial Tr. 382:20–25, 383:1–20 (Terry Kelly's testimony); 04/07/2016 Trial Tr. 520:11–16, 521:18–25, 522:1–16 (Dean's testimony); 04/08/2016 Trial Tr. 716:15–18, 723:12–22 (Creel's testimony); 04/11/2016 Trial Tr. 188:8–13 (Thomas Parker's testimony). ABM members were required to pay monthly dues to the ABM treasury and attend "church meetings" in either prison or the free world to "discuss business" and occasionally mete out punishment for member violations. 04/05/2016 Trial Tr. 74:10–11, 75:20–25, 76:1–15 (Hubanks' testimony); 04/06/2016 Trial Tr. 220:11–17 25; 221:1–13 (Mask's testimony); 04/06/2016 Trial Tr. 387:3–11 (Kelly's testimony); 04/07/2016 Trial Tr. 516:16–17 22–25, 517:1 (Dean's testimony). The ABM had symbolic colors (purple, gold, black, red, and blue) and a five-step handshake. 04/06/2016 Trial Tr. 226:11–23 (Mask's testimony).

Trial testimony and recorded conversations further demonstrated that the ABM was militaristically structured with lingo to describe the various members of the organization. ABM "family" were the members; a three-member "wheel," referred to individually as "spokes," were the directors or shot callers, each overseeing a particular area of Mississippi and issuing direct orders to subordinates; "state captains" were appointed by the wheel to establish communication throughout the organization and a roster to keep track of ABM members state-wide, as well as violations, concerns with other gangs, and dues owed by members to the ABM; a "captain" presided over each of the three designated zones in Mississippi, known as North, Central, and Southern; and a facility "captain" presided over each prison facility with ABM presence. Each zone and facility could include two "lieutenants," who assisted the captain with carrying out orders and delegated responsibilities to ABM members; a "sergeant-at-arms" to maintain order

and discipline; a "treasurer" to collect, manage, and distribute ABM money throughout Mississippi; and numerous "soldiers." *E.g.*, 04/05/2016 Trial Tr. 56:3–9, 60:6–25, 61:15–18, 66:12–25, 67:1–6, 155:4–19 (Hubanks' testimony); 04/06/2016 Trial Tr. 218:14–25, 219:1–25, 221:14–16, 232:24–25, 233:1–2 (Mask's testimony); 04/06/2016 Trial Tr. 334:14–22 (Bailey's testimony); 04/06/2016 Trial Tr. 383:21–25, 384:1 (Kelly's testimony); 04/07/2016 Trial Tr. 519:15–25, 520:1–6 (Dean's testimony); 04/08/2016 Trial Tr. 720:19–22, 723:7–16 (Creel's testimony); 04/11/2016 Trial Tr. 883:5–9 (Marty Miller's testimony). Testimony and numerous wiretapped phone conversations demonstrated that ABM wheel members/spokes communicated at least twice weekly by mobile phones, which were contraband in the prison system and had to be smuggled in. *E.g.*, 04/05/2016 Trial Tr. 63:21–25, 64:1–7, 81:19–24, 90:21–23, 130:18–20 (Hubanks' testimony); 04/06/2016 Trial Tr. 211:16–20, 212:25, 213:1–7, 233:14–21, 236:3–6, 305:11 (Mask's testimony).

Wheels could issue direct orders and mete out punishment, ranging from assault of an ABM member who had violated ABM rules (a smash-on-sight or "S.O.S.") by forcefully removing the tattoo signifying gang membership by burning, cutting, or tattooing over the brand), to a kill-on-sight or "K.O.S.", meaning the murder of a rival gang member or an ABM member or associate who committed a serious violation of the ABM's rules; subordinates were required to follow direct orders or be in violation and subject to discipline. *E.g.*, 04/05/2016 Trial Tr. 72:3–25, 73:1–4, 132:13–14, 155:4–19 (Hubanks' testimony); 04/06/2016 Trial Tr. 218:14–15, 219:3–4 10–25, 220:1 (Mask's testimony); 04/06/2016 Trial Tr. 343:7–10 (Bailey's testimony); 04/06/2016 Trial Tr. 383:23–25, 384:1 10–11 22–25, 385:1–2 (Kelly's testimony); 04/07/2016 Trial Tr. 519:15–19, 525:10–17 (Dean's testimony); 04/08/2016 Trial Tr. 666:25–25,

667:1, 698:19–21, 699:5–7, 702:24–25, 703:1 (Valentine's testimony); 04/08/2016 Trial Tr. 714:13–17, 723:7–11 (Creel's testimony).

The evidence supported the existence of an organization with a hierarchical structure or chain of command, definitely within the scope of a RICO enterprise.

In addition to the proof that the ABM was criminal enterprise engaged in numerous criminal acts throughout Mississippi, the Government presented extensive testimony and audio recordings showing the specific involvement of Parker and Owens in the RICO conspiracy. The Court reiterates that there is no requirement that the Government show that each defendant personally agreed to or was even aware of each individual racketeering activity of the ABM; the Government need only show that "two or more people agreed to commit a substantive RICO offense and that the [particular] defendant knew of and agreed to the <u>overall objective</u> of the RICO offense." *See Rosenthal*, 805 F.3d at 530 (emphasis added).

Ample evidence showed that Parker and Owens <u>at least</u> knew of and agreed to the overall objective of the RICO offense; in fact, the evidence showed that Parker and Owens were committed members of the ABM criminal conspiracy who functioned in different leadership roles. The Government established that Parker and Owens were active ABM members by introducing photographs of each displaying their ABM tattoos. *See, e.g.*, Gov't's Ex. 52 (photographs of Parker's tattoos); Gov't's Ex. 43 (photographs of Owens' tattoos).

Further evidence showed that Owens, who had attained ABM thunder warrior status and was an area captain in 2010 and a wheel member/spoke in 2013, oversaw operations in the south Mississippi area of the ABM while incarcerated in north Mississippi at Marshall County and in south Mississippi in Greene County. 04/05/2016 Trial Tr. 61:22–25, 62:1–9, 78:20–21 (Hubanks' testimony); 04/06/2016 Trial Tr. 212:10–18, 233:10–11, 256:4–25, 264:20–25,

12

265:13–15 (Mask's testimony); 04/07/2016 Trial Tr. 521:16–17, 525:4–5 (Dean's testimony); 04/07/2016 Trial Tr. 601:15–16 (Walter Burrus' testimony); 04/08/2016 Trial Tr. 723:23–24 (Creel's testimony); 04/11/2016 Trial Tr. 791:13–15, 794:18–19 (Thomas Parker's testimony). While an area captain, Owens handled trouble and personnel issues at each facility in the area. 04/06/2016 Trial Tr. 210:4–9 (Mask's testimony). Owens was in favor of the ABM's unification efforts to be recognized nationally and to further their drug trafficking efforts and developed plans to make the ABM's national unification a reality. *Id.* 230:6–11 (Mask's testimony); 04/08/2016 Trial Tr. 665:1–4 (Valentine's testimony); 04/08/2016 Trial Tr. 725:3–4 (Creel's testimony); 04/11/2016 Trial Tr. 806:13–25, 807:1–23 (Thomas Parker's testimony). Mask testified that he and Owens trafficked in meth together. 04/06/2016 Trial Tr. 243:16–22, 247:21–23, 285:16–21, 286:1–5, 288:22–25, 289:1, 291:21–25, 292:1–4, 293:7–13 18–25. Extensive evidence also supported that Owens orchestrated the kidnapping and murder of Hudson, and committed the murder of Hudson with Parker; evidence further demonstrated that after the murder of Hudson, Owens rose to the highest rank (wheel member/spoke) and was instrumental in the activities of the ABM, including meth trafficking, assaults, and attempted murder, particularly issuing the order to stab ABM member Jeremy Bailey and overseeing the stabbing.

The evidence further showed that in 2010 Parker was an area captain over south Mississippi who committed racketeering acts with other members of the ABM, including meth trafficking and aiding and abetting in the murder of Hudson. *E.g.*, 04/07/2016 Trial Tr. 524:19–22 (Dean's testimony); 04/11/2016 Trial Tr. 794:9–10 16–17 (Thomas Parker's testimony); 04/11/2016 Trial Tr. 882:16–23 (Miller's testimony). Parker attained thunder warrior status and became the right-hand man of Brandon Creel, who was then a wheel member/spoke. 04/08/2016

Trial Tr. 723:25, 724:1–3 (Creel's testimony); 04/11/2016 Trial Tr. 793:19–20, 794:9–17 (Thomas Parker's testimony); 04/11/2016 Trial Tr. 831:21–25, 832:19–21, 833:20–23, 836:11–25, 837:9–10 21–25; 838:1–3 (Jo Kayln Henderson's testimony).

Accordingly, "the evidence sufficiently indicated that [Parker and Owens] knew of and agreed to further the overall objectives of the [ABM] enterprise." *See Herrera*, 466 F. App'x at 420. Thus, the Court holds there was sufficient evidence for a rational jury to find Defendants Parker and Owens guilty of a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

### 2. *Methamphetamine Trafficking Conspiracy (Parker)*

The jury found Parker guilty on Count 2 for conspiracy to possess with intent to distribute meth in violation of 21 U.S.C. § 846, which was also a racketeering act of the ABM charged in the superseding indictment.

The elements of a conspiracy under 21 U.S.C. § 846 are that "(1) an agreement existed between two or more persons to violate federal narcotics law, (2) the defendant knew of the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy." *United States v. Thomas*, 690 F.3d 358, 366 (5th Cir.), *cert. denied*, —— U.S. ——, 133 S. Ct. 673, 184 L. Ed. 2d 477 (2012). "The essence of the crime of conspiracy is the agreement to commit an unlawful act." *United States v. Mills*, 555 F. App'x 381, 385 (5th Cir.) (per curiam), *cert. denied*, 135 S. Ct. 140, 190 L. Ed. 2d 105 (2014) (citing *Iannelli v. United States*, 420 U.S. 770, 777, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975)). "The agreement need not be explicit, but can be inferred from the facts and circumstances of the case." *Id.* (citing *Iannelli*, 420 U.S. at 777 n.10, 95 S. Ct. 1284); *see United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996) (citing *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991) (These elements "may be inferred from the development and collocation of circumstances.")). "[T]he government must prove beyond a

14

reasonable doubt . . . that the accused knew of the conspiracy . . . ." *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir. 1983). However, "[t]o be convicted of engaging in a criminal conspiracy, an individual need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir. 1998) (internal citation omitted).

First, the evidence at trial clearly supported the ABM's involvement in meth trafficking. Audio recordings and testimony from former ABM wheel members/spokes established that the ABM ran a drug operation with a focus on meth trafficking—for the purpose of obtaining money. *E.g.*, 04/05/2016 Trial Tr. 67:7–20 (Hubanks' testimony); 04/06/2016 Trial Tr. 209:19–25, 210:1–3, 213:21–25, 214:1–4 (Mask's testimony); 04/08/2016 Trial Tr. 725:22–25, 726:1–25, 736:14–18 (Creel's testimony). The drug operation was both inside prison facilities and in the free world, with a treasury containing money from the sale of drugs; drug proceeds were transferred within the prison system by Western Union, MoneyGram, or Green Dot prepaid cards that could be purchased at retail stores in the free world. *E.g.*, 04/05/2016 Trial Tr. 67:15–20 (Hubanks' testimony); 04/06/2016 Trial Tr. 213:21–25, 214:1–4, 222:4–25, 223:1–11, 234:5–25 (Mask's testimony). It was customary for a purchaser to load money from his bank account to a prepaid card and ABM members to then distribute the drug proceeds from the ABM treasury to ABM members as determined necessary for bond money, electric bills (in the free world), debts owed by ABM members to other prison gangs, loans to ABM members, etc. *E.g.*, 04/05/2016 Trial Tr. 68:1–23 (Hubanks' testimony); 04/06/2016 Trial Tr. 236:20–25, 237:1–9 (Mask's testimony).

Extensive evidence further demonstrated that the ABM was pursuing unification with the national Aryan Brotherhood organization in 2013 to solidify meth trafficking and money laundering. *E.g.*, 04/05/2016 Trial Tr. 88:20–24 (Hubanks' testimony); 04/06/2016 Trial Tr. 229:4–25, 230:1–2 (Mask's testimony); 04/08/2016 Trial Tr. 664:23–25 (Valentine's testimony); 04/08/2016 Trial Tr. 724:16–25 (Creel's testimony). Although apparently unification never occurred, Perry Mask testified that if unification had occurred the ABM planned to deposit 10 to 25 percent of the drug proceeds in the ABM treasury. 04/06/2016 Trial Tr. 231:16–22.

Dwayne Smith, formerly of the Oxford DEA, testified that the ABM was identified as a drug trafficking organization operating in the Northern District of Mississippi and that law enforcement seized more than twenty pounds of meth and $130,000 as a result of their investigation. 04/05/2016 Trial Tr. 17:1–4 12–13 16–17. Don Douglas of the Oxford DEA testified that the case sub judice began through a meth investigation that revealed at least part of the meth trafficking done by the ABM was being orchestrated from Marshall County Correctional Facility, specifically by Perry Mask, who pled guilty in this case to meth trafficking. *Id.* 168:8–25, 169:1–2. According to Douglas, Mask orchestrated the pickup of meth in El Cajon, California by an associate, who then transported the drug south and was apprehended by law enforcement in Arkansas; five pounds of meth were seized in that investigation. *Id.* 181:12–25, 182:1–3.

Clay McCombs, investigator for Leake County Sheriff's Department and contract agent for the Mississippi Bureau of Narcotics with approximately twelve years experience in the field, testified that he investigated meth trafficking in 2013 involving a man named Michael McLemore, who sold vast quantities of meth—stored in two-pound bags, with each bag placed inside an empty hominy can—to a man named Charlie Carol, who then distributed it to Central

Mississippi and North Mississippi; at least twenty pounds of the meth distributed to North Mississippi was then sold to members of the ABM. 04/07/2016 Trial Tr. 426:11–21, 427:4–24, 428:10–25, 429:1–25, 430:1–12, 432:7–9, 439:13–16. McCombs testified that this particular meth seizure was the largest one of his career, consisting of a total of nineteen pounds of meth. *Id.* 426:11–14, 436:25, 437:1–3. Jay Hoppenwasser with the DEA South Central Laboratory in Texas, an expert witness in chemistry for the Government, testified that the bags contained 97 percent meth hydrochloride and 3 percent dimethyl sulfone (cutting agent to increase volume). *Id.* 451:3–4, 452:2–3, 491:6–7.

Although some testimony was that Parker sold drugs independently of the ABM, or with another member of the ABM as a personal pursuit, what is critical for this conviction is that "(1) an agreement existed between two or more persons to violate federal narcotics law, (2) [Parker] knew of the existence of the agreement, and (3) [Parker] voluntarily participated in the conspiracy." *See Thomas*, 690 F.3d at 366. The jury heard ample testimony that Parker engaged in a series of drug transactions geared toward the common purpose of possession and distribution of narcotics for profit with the ABM. A specific example was the sale of meth to Hudson, who was kidnapped and murdered after eventually refusing to repay the drug debt he owed to Parker.

Parker's involvement with the ABM's meth trafficking was also supported by evidence of other activity. For instance, Parker's former live-in girlfriend, Jo Kayln Henderson, testified that drug trafficking was Parker's main occupation and that she witnessed continuous small sales of meth to multiple ABM members, approximately two to three ounces weekly. 04/11/2016 Trial Tr. 836:11–25, 837:9–10 21–25, 838:1–3. Duane O'Clare, former narcotics officer at the West Memphis Police Department, testified that in 2010 he executed a traffic stop in Arkansas; Parker was the driver, and Owens was the passenger. O'Clare testified that when he questioned

Owens and Parker about why they were in West Memphis, they advised that they were there to purchase over-the-counter pseudoephedrine at the West Memphis Walmart to transport to Mississippi and sell to cooks. 04/07/2016 Trial Tr. 419:1–7 14–25, 420:1–2 (O'Clare's testimony). Furthermore, Walter Burrus, former ABM soldier, testified that he once bought meth from an ABM member who was selling meth for Parker; that the meth was "bad," that is, cut with substances other than meth; that he later confronted Parker about it, telling him he either wanted a refund or a replacement with good meth; and that Parker agreed to make it right and replaced the bad meth with good meth. *Id.* 602:13–25, 603:1–5, 604:4–6. Valentine testified that Owens, his former roommate, had purchased $1,000 worth of meth from Parker (likely an ounce) and owed him for it. 04/08/2016 Trial Tr. 669:13–25. Further, Creel testified that he—a then-wheel member/spoke—teamed up with Parker from 2010 to the latter part of 2012 to sell meth, and that the two jointly moved ten to twenty pounds of meth during that time. *Id.* 725:25, 726:1–18 (Creel's testimony). Former ABM member Marty Miller also testified that he bought meth from Parker and several other different ABM members. 04/11/2016 Trial Tr. 882:16–23.

From that evidence, the jury could—and did—reasonably infer, based on the ABM's structure and objectives and the evidence linking Parker to the ABM, that Parker agreed to join the large conspiracy and that his meth sales were conducted as part of the ABM enterprise. *See Herrera*, 466 F. App'x at 416. Accordingly, the evidence allowed a rational jury to find beyond a reasonable doubt that Parker knowingly participated in a conspiracy to possess with intent to distribute meth in violation of 21 U.S.C. § 846.

### 3. *Kidnapping in Aid of Racketeering (Owens)*

The jury found Owens guilty on Count 3 for the kidnapping of Michael Hudson in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (2), which was also a racketeering act of the ABM charged in the superseding indictment.

Title 18 U.S.C. § 1959 provides in pertinent part: "Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, . . . kidnaps . . . any individual in violation of the laws of any State or the United States . . . [is guilty of kidnapping in aid of racketeering]." The superseding indictment alleged that Owens committed kidnapping under Mississippi law. *See* Superseding Indictment [203] ¶ 12. To establish Owens' guilt for Kidnapping in Aid of Racketeering, the Government had to show five elements: (1) that the ABM was a RICO enterprise; (2) that the ABM was engaged in racketeering activity; (3) that Owens had a position in the ABM; (4) that Owens committed the kidnapping of Hudson in violation of Mississippi law; and (5) that Owens' general purpose in doing so was to maintain or increase his position in the ABM. For the reasons discussed *supra* regarding the RICO conspiracy charges, the first three elements were met. Therefore, the Court proceeds directly to analyzing the last two elements.

Under Mississippi law, the crime of kidnapping occurs when "[a]ny person . . . without lawful authority and with or without intent to secretly confine . . . forcibly seize[s] and confine[s] any other person." Miss. Code. Ann. § 97-3-53. "Circumstantial evidence is sufficient to prove the elements of kidnapping"; "direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt. " *Underwood v. State*, 708 So. 2d 18, 35 (Miss. 1998).

The evidence at trial showed that the ABM authorized the kidnapping of Hudson by certain members and that the kidnapping of Hudson was in aid of the racketeering activities of the ABM, which, according to the Government's evidence, exercised forceful control over its members to ensure loyalty and obedience to the gang. The evidence further showed that Owens' general purpose in committing the kidnapping was to maintain or increase his position in the ABM.

Both former ABM sergeant-at-arms James Dean and former ABM lieutenant Walter Burrus testified that the Hudson issue was first raised at an ABM "church" meeting in the summer or fall of 2010 in Gulfport, Mississippi, and that the church meeting was attended by ABM members, including Owens, Brandon Creel, Mitchell Valentine, Sonny Maxwell, Thomas Burrus, and James Dean. 04/07/2016 Trial Tr. 538:7–9 18–25, 539:1–8 (Dean's testimony); *id.* 604:7–18 (Burrus' testimony). During the church meeting, then-area captain Owens discussed the approximately $600 drug debt owed to Parker for meth. *Id.* 539:19–25, 540:23–25 (Dean's testimony); *id.* 604:19–24 (Burrus' testimony).

James Dean testified that several days later the ABM held another church meeting attended by Owens, Michael Hudson, Mitchell Valentine, Thomas Burrus, and Parker by speakerphone. *Id.* 540:9–22, 541:12–14. Dean further testified that in that second meeting Owens reiterated that Hudson (sometimes referred to as "Skip") owed the drug debt to Parker and was required to pay the debt. *Id.* 540:23–25. A dispute arose between Hudson and Parker concerning the quality of the meth Hudson purchased from Parker; Parker gave Hudson two weeks to pay half of the debt owed. *Id.* 541:25, 542:1–16 (Dean's testimony); 04/08/2016 Trial Tr. 672:8–10 (Valentine's testimony). Extensive testimony demonstrated that Hudson never paid Parker the debt owed, and that as a result, Hudson was subject to an ABM violation.

04/07/2016 Trial Tr. 543:1–5 (Dean's testimony), *id.* 604:25, 605:1 (Burrus' testimony); 04/08/2016 Trial Tr. 672:11–25 (Valentine's testimony). Brandon Creel testified that the situation was a personal issue between Parker and Hudson and that the ABM had no dog in that fight. 04/08/2016 Trial Tr. 736:25, 737:1–3. However, extensive testimony established the ABM's instrumental role in the events. *See, e.g.*, 04/08/2016 Trial Tr. 673:12–15 (Valentine's testimony that the situation "went from a minute thing with Parker to a violation in the family").

Testimony further demonstrated that Creel, as a wheel, had ordered minutes between Parker and Hudson. *Id.* 738:2–4 (Creel's testimony); *id.* 672:20–25 (Valentine's testimony that Hudson was ordered to submit to minutes between himself and Parker). *See* 04/06/2016 Trial Tr. 227:17–20, 228:2–7 (Mask's testimony that if one ABM member owed drug money to another ABM member, an order of "minutes" (a fistfight) between the two brothers was common).

Thomas Parker testified that, according to Owens, Creel had authorized a smash-on-sight against Hudson. 04/11/2016 Trial Tr. 801:3–5 (Thomas Parker's testimony). Burrus testified that Owens was the ABM member responsible for coordinating the attack on Hudson, and that Owens said he was going to give Hudson the option of either thirteen punches to the chest while saluting—and if dropping the salute, being jumped on by all ABM members present—or "two minutes with two brothers," wherein an ABM member must fight two brothers for two minutes standing. 04/07/2016 Trial Tr. 605:5–25.

Extensive, mostly consistent testimony established the circumstances and events pertaining to the kidnapping and killing of Hudson. Dean testified that in late 2010 he was supposed to pick up Hudson at a gas station and bring him to the brothers to receive a smash-on-sight violation, and that Hudson told him over the phone that he would be there in about ten minutes, but did not show up. *Id.* 543:6–8 18–23. Dean testified that he called Owens and

informed him Hudson had not shown up; Dean then left. *Id.* 543:23–25. Burrus testified that

Owens was mad because he felt like he was lied to. *Id.* 606:6–9. Creel testified that a captain—

such as Owens—was well within the scope of his authority to issue an order for violation of an

order to have minutes. *See* 04/08/2016 Trial Tr. 738:17–18.

Dean and Maxwell, who was a then-ABM prospect recruited by Dean, both testified that

the two of them went to the Walgreen's in Slidell, Louisiana to purchase pseudoephedrine to

make meth; Dean testified he saw Hudson there and told him that the ABM brothers wanted to

kill him. 04/07/2016 Trial Tr. 544:15–25 (Dean's testimony); 637:12–17 (Maxwell's testimony).

However, Dean did not report to Owens at that time that he had seen Hudson. *Id.* 546:19–21

(Dean's testimony).

Dean testified that about a month later Owens ordered that Hudson be kidnapped and

violated, and that Owens told Dean he was going to gift-wrap Hudson and give him to Parker.

*Id.* 547:23–24, 548:11–18. Accordingly, Burrus picked up Owens and Mitchell Valentine and,

according to Owens' orders, transported them to ABM member Walter Eaves' residence in

Gautier, Mississippi. *Id.* 607:14–25, 608:4–10 (Burrus' testimony); 04/08/2016 Trial Tr.

675:25–25, 676:1 (Valentine's testimony). Both Valentine and Burrus testified that Owens at

least gave them an idea of what was going to happen to Hudson. According to Valentine, Owens

said during the car ride over that Hudson would not be coming home that night, and that Owens

had brought wire to bind Hudson. 04/08/2016 Trial Tr. 676:11–18, 677:7–9. Burrus testified

that Owens had informed him five minutes before what was going to take place and that Owens

instructed Burrus to park the car near the back door of the trailer, near the bedroom. 04/07/2016

Trial Tr. 608:19–22, 610:6–13. Valentine said at some point after arriving at Eaves' trailer,

Owens cut the wire down to five feet. 04/08/2016 Trial Tr. 676:7–9.

Unequivocal testimony established that, according to Owens' orders, Dean and ABM prospect Maxwell kidnapped Hudson by asking him to help cook some meth at Eaves' trailer. 04/07/2016 Trial Tr. 549:16–256, 550:1–2 (Dean's testimony); *id.* 638:20–24 (Maxwell's testimony); 04/08/2016 Trial Tr. 675:17–23 (Valentine's testimony). Dean and Maxwell picked up Hudson in Maxwell's truck and drove him to Eaves' house, according to Owens' instructions. 04/07/2016 Trial Tr. 550:24–25, 551:1 (Dean's testimony); *id.* 636:23–24, 637:5–6 (Maxwell's testimony). Dean testified that when the three arrived at the street where Eaves lived, Dean called Owens and told him were pulling up with Hudson; Owens responded that they were ready for him. 04/07/2016 Trial Tr. 551:18–20. The three then arrived at Eaves' trailer, and Eaves opened the door and escorted the three to the back bedroom, which was mostly bare except for a box springs and mattress propped against the wall. 04/07/2016 Trial Tr. 551:20–25, 552:1–4 (Dean's testimony); *id.* 608:14–17, 609:1–13 (Burrus' testimony); *id.* 639:15–16 21–25 (Maxwell's testimony); 04/08/2016 Trial Tr. 677:14–25, 679:16–21 (Valentine's testimony).

Extensive testimony further showed that Eaves, Valentine, Owens, Maxwell, and Burrus entered the bedroom and began to beat Hudson. 04/07/2016 Trial Tr. 552:12–14, 553:8–11 (Dean's testimony); *id.* 609:21–25, 610:1–3 (Burrus' testimony); *id.* 640:9–15 (Maxwell's testimony); 04/08/2016 Trial Tr. 680:4–7 (Valentine's testimony). Dean testified that Owens hit Hudson with his billy club in the middle of the forehead and that Hudson's forehead started bleeding and Hudson yelled. 04/07/2016 Trial Tr. 553:21–25, 554:1–6. Valentine testified that Owens hit Hudson in the back of the head with his billy club and Hudson bled on the floor. 04/08/2016 Trial Tr. 681:6–7 21–25. Valentine testified that after the beating, Owens removed the battery from Hudson's cell phone. *Id.* 682:3–5. Jackson "Jason" Price, special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives with fourteen years experience in the

field, testified that law enforcement determined from mapping and determining GPS coordinates that the last location of Hudson's cell phone was near the cell tower in Gautier, Mississippi, and that that cell tower was less than one mile from Eaves' residence in Gautier. 04/11/2016 Trial Tr. 934:7–256, 935:1–25, 936:1–9 (Price's testimony).

Testimony showed that Hudson was "hog tied," with the wire Owens brought along, both feet bound together and both hands bound together behind his back. 04/07/2016 Trial Tr. 610:15–16, 611:8–13 (Burrus' testimony); *id.* 640:21–22 (Maxwell's testimony); 04/08/2016 Trial Tr. 681:14–20 (Valentine's testimony); 04/11/2016 Trial Tr. 800:6–12 (Thomas Parker's testimony).

Burrus testified that Owens told him to open the trunk of his car. 04/07/2016 Trial Tr. 610:23–24 (Burrus' testimony). Burrus then told Dean to follow him; Burrus opened the trunk and told Dean to grab a piece of plastic that was lying nearby (described as a tent or tarpaulin). *Id.* 554:25, 555:1–2 11–12 (Dean's testimony); *id.* 611:3–4 (Burrus' testimony). Dean grabbed the plastic and spread it over the trunk interior, and a couple of them threw Hudson in Burrus' car trunk. *Id.* 555:12–14 (Dean's testimony); *id.* 611:14–17 (Burrus' testimony); 04/08/2016 Trial Tr. 682:8–17 (Valentine's testimony); 04/11/2016 Trial Tr. 642:1–5 (Maxwell's testimony). Burrus, Valentine, and Owens stepped into Burrus' car, with Hudson in the trunk, and headed to Parker's house in Petal, Mississippi—about a one hundred mile drive; Dean and Maxwell got back into Maxwell's truck and followed for a short time but then headed another way. 04/07/2016 Trial Tr. 555:23–25, 556:1–2 8–22, 557:11–13 (Dean's testimony); *id.* 611:20–22, 612:4–6 (Burrus' testimony); *id.* 642:6–16 (Maxwell's testimony); 04/08/2016 Trial Tr. 682:18–25, 683:22–25, 684:1–6 (Valentine's testimony); 04/11/2016 Trial Tr. 798:13–25, 799:1–6 19–25, 800:1–5 (Thomas Parker's testimony). Dean testified that after the kidnapping

he did not want to follow Burrus, Valentine, and Owens, because Dean did not want to witness a murder. 04/07/2016 Trial Tr. 556:25, 557:1.

Extensive testimony further established that ABM prospect Maxwell participated in the assaulting and kidnapping of Hudson to earn his ABM brand and become a member; that Owens instructed him to do so; and that at the conclusion of the act, Dean tattooed the ABM brand on Maxwell, based on Owens' instructions to do so. *Id.* 550:3–23 (Dean's testimony); *id.* 607:3–11 (Burrus' testimony); *id.* 636:22–25, 637:1–2 (Maxwell's testimony). Although not particularly supported by other testimony, Valentine testified that then-ABM wheel Creel ultimately authorized Maxwell to receive his ABM brand for smashing out Hudson. 04/08/2016 Trial Tr. 20:14–16. Maxwell testified that the day following the Hudson incident Owens called him and he completed paperwork and officially joined the ABM. 04/07/2016 Trial Tr. 643:17–23.

### 4. *Murder in Aid of Racketeering (Parker and Owens)*

The jury found Parker and Owens guilty on Count 4 for the murder of Michael Hudson in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (2), which was also a racketeering act of the ABM charged in the superseding indictment.

Title 18 U.S.C. § 1959 provides in pertinent part: "Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, . . . murders . . . any individual in violation of the laws of any State or the United States . . . [is guilty of murder in aid of racketeering]." The superseding indictment charged that the murder of Michael Hudson constituted murder under Mississippi law. *See* Superseding Indictment [203] ¶ 14. Thus, to establish Parker's and Owens' guilt for VICAR murder, the Government had to show five elements: (1) that the ABM was a RICO enterprise; (2) that the ABM was engaged in racketeering activity; (3) that Parker and Owens each had a position in the

ABM; (4) that Parker and Owens committed the murder of Hudson in violation of Mississippi law; and (5) that Parker's and Owens' general purpose in doing so was to maintain or increase position in the ABM. For the reasons discussed *supra* regarding the RICO conspiracy charges, the first three elements were met. Therefore, the Court proceeds directly to analyzing the last two elements.

Under Mississippi law as relevant here, "(1) [t]he killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder . . . ." Miss. Code Ann. § 97–3–19(1)(a). "[P]remeditation is an element of murder." *Fears v. State*, 779 So. 2d 1125, 1131 (Miss. 2000). By definition, premeditation "connotes a prior design to kill for some appreciable time. Appreciable time allows the opportunity for reflection and consideration before committing the act." *Id.*

Also under Mississippi law as relevant here, "[d]epraved-heart murder, now 'second-degree murder,' is a killing 'done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . .' " *Holliman v. State*, 178 So. 3d 689, 698 (Miss. 2015), *reh'g denied* (Dec. 3, 2015) (quoting Miss. Code Ann. § 97–3–19(1)(b)). "Depraved-heart murder encompasses a reckless and eminently dangerous act directed toward a single individual, from which malice is implied." *Id.* 698–99 (internal quotation marks and citation omitted).

The evidence at trial showed that the ABM authorized the murder of Hudson and that the murder of Hudson was in aid of the racketeering activities of the ABM, which, according to the Government's evidence, exercised forceful control over its members to ensure loyalty and

obedience to the gang. The evidence further showed that Parker's and Owens' general purpose in committing the murder was to maintain or increase their respective positions in the ABM.

Following the kidnapping and assault of Hudson, Burrus testified that Owens decided to take Hudson to Parker's residence in Petal, Mississippi, so that Owens and Parker could finish out the violation. 04/07/2016 Trial Tr. 606:24–25, 607:1–2, 613:20–23. Similarly, Valentine testified that Owens wanted to ensure Hudson got to Parker's residence to face him about the unpaid debt. 04/08/2016 Trial Tr. 675:10–13.

Burrus testified that in the car, Valentine told Owens he could have killed Hudson with the billy club, and Owens responded that Hudson had better be glad he did not kill him. 04/07/2016 Trial Tr. 612:21–25, 613:1. Burrus then testified that Owens and Hudson cursed and talked back and forth while Hudson was confined to the trunk of the car, and Owens told Hudson he knew he would get him and he was going to have to face Parker. *Id.* 613:2–4 11–13. Valentine testified that Owens then told Hudson to shut up or they were going to pull over and Owens would "poke a hole in [Hudson's] lung." *Id.* 683:18–19.

Testimony then established that Owens told Parker in a cell phone conversation that he had a gift for him. *Id.* 614:1–3 (Burrus' testimony); *id.* 683:11–15 23–24 (Valentine's testimony). Burrus, Valentine, and Owens then arrived at Parker's residence and took Hudson out of the car trunk; Hudson was conscious enough to take a drag off Valentine's cigarette; Parker arrived about five minutes later. *Id.* 614:9–17 (Burrus' testimony). Once Parker arrived, Owens told Valentine and Burrus to go home; they did. *Id.* 614:18–20 (Burrus' testimony); 04/08/2016 Trial Tr. 685:21–24 (Valentine's testimony). Once they left, Valentine and Burrus removed the plastic from the trunk and cleaned out the trunk with Windex. 04/07/2016 Trial Tr. 615:2–13 (Burrus' testimony); 04/08/2016 Trial Tr. 686:2–7 (Valentine's testimony).

According to extensive and unequivocal testimony, Parker and Owens were the only two involved in the killing of Hudson. Neither Parker nor Owens testified; therefore, the circumstances and events pertaining to the murder were established by testimony from those who talked to Owens or Parker after the fact.

Then-ABM state captain Thomas Parker testified that at Eric Parker's residence, a camping trailer, Owens put Eric Parker on the spot about what he was going to do about the drug debt owed to him by Hudson. 04/11/2016 Trial Tr. 798:12–25, 799:1. Thomas Parker further testified that Owens admitted to him that he and Parker killed Hudson together, and that Owens forced Parker to stab Hudson to make him guilty as well. *Id.* 799:8–13. Eric Parker's former girlfriend, Jo Kayln Henderson, testified that Parker had nightmares and once woke up screaming and sweating and saying that he murdered someone. *Id.* 850:11–14. Henderson further testified that Parker confessed to her that he strangled Hudson until he started bleeding out of his eyes, nose, ears, and mouth, and that Hudson was already halfway dead when he was first brought to Parker's trailer. *Id.* 851:8–11. Creel testified that Parker told him that he choked Hudson to death with a bat. 04/08/2016 Trial Tr. 754:22–23.

Valentine testified that the next morning he called Eric Parker, who said he and Owens were finishing up some business and following Creel in a vehicle. *Id.* 687:14–25, 688:1–2. Testimony showed that later that day Owens called Valentine to pick him up at Eric Parker's trailer. Both Valentine and Henderson testified that the camping trailer smelled very clean. *See id.* 688:9–25 (Valentine's testimony); 04/11/2016 Trial Tr. 844:18–20 (Henderson's testimony).

The overwhelming evidence in the trial supported a murder conviction for both Parker and Owens. Some testimony by Creel supported that the murder was not committed in aid of racketeering, but was an isolated incident by Owens and Parker. *See, e.g.*, 04/08/2016 Trial Tr.

736:25, 737:1–3 (testifying that the incident was due to a personal situation between Parker and Hudson), *id.* 744:12 (testifying that Parker told him the situation had gotten out of hand), *id.* 755:6–11 (testifying there was no authorization for the killing). However, extensive testimony and evidence supported that the murder was in fact committed in aid of racketeering. Former ABM wheel member/spoke Perry Mask testified that Owens told him that Hudson was killed because Hudson (an ABM member) owed Parker (an area captain) for drugs, and Parker, in turn, owed Creel (a then-wheel member/spoke) for drugs; thus, Parker was pressured for the money owed to Creel. 04/06/2016 Trial Tr. 269:13–19. Former ABM member Dean testified that when he and Maxwell saw Michael Hudson in the Slidell Walgreen's after Hudson had failed to show up for his violation, Dean told Hudson that the ABM brothers wanted to kill him. 04/07/2016 Trial Tr. 544:15–25, 546:4–5. Dean testified that prior to the kidnapping Owens asked him if he wanted to earn thunder warrior status in the ABM by stabbing Hudson; Dean said he rejected the offer. *Id.* 547:1–15. Dean testified that he believed that although the order against Hudson was initially a smash-on-sight, it was elevated to a kill-on-sight order when Hudson did not show up for his violation. *Id.* 573:9–22. Henderson testified that Parker told her if he had not participated in killing Hudson, Owens would have killed Parker. 04/11/2016 Trial Tr. 851:4–5. Henderson also testified that Parker told her if she told anyone about the murder that Parker would tell the ABM and they would come after Henderson and her family. *Id.* 852:20–24.

Testimony from former ABM leaders who pled guilty further supported that the ABM kept the murder under wraps. Brandon Creel, then-ABM wheel member/spoke, testified that Parker contacted him by phone after the murder and told him he needed Creel to help with a situation; Creel went to Parker's camping trailer. 04/08/2016 Trial Tr. 742:21–25, 743:1–5. Thomas Parker testified that Owens said that he and Eric Parker called Creel for help because

they trusted him. 04/11/2016 Trial Tr. 800:24–25. Creel testified that when he got to Parker's house Parker was a wreck and Owens was pale but calm. 04/08/2016 Trial Tr. 741:7–10. Creel further testified that—while a wheel member/spoke and "in charge"—he (Creel) planned to burn and did burn the body of Hudson and agreed to dispose of the body. *Id.* 745:11–19 (Creel's testimony); *see id.* 800:13–17 (Thomas Parker's testimony). Although Creel testified that he never actually saw Hudson's body because it was wrapped in carpet, *id.* 745:3–6, Creel testified in great detail about how he burned Hudson's body and all instruments involved in the murder over a four-to-five-day period and, further, how he disposed of the remains in a river, *see id.* 748:21–25, 749:1–25, 750:1–25, 751:1–25, 752:1–16, 753:1–25, 754:10–15. Henderson testified that Parker told her they needed to rent a carpet cleaner to clean the floors. *Id.* 847:5–10. Valentine testified that while he and Owens were riding back home, Owens said they wouldn't have to worry about Hudson anymore, that he would never be found. 04/08/2016 Trial Tr. 691:20, 23–24.

Thomas Parker testified that Owens and Eric Parker then burned the camping trailer because they could not remove all the blood from the trailer. 04/11/2016 Trial Tr. 803:5–7.

Extensive testimony further established that several meetings were held to discuss the Hudson incidents.

Dean, Burrus, and Valentine testified that days after the incident, Owens called a meeting at Mitchell Valentine's trailer (where Owens was living with Valentine) among Owens, Burrus, Maxwell, Dean, and Valentine. 04/07/2016 Trial Tr. 557:24–25, 558:1–4 (Dean's testimony); *id.* 615:14–23 (Burrus' testimony); 04/08/2016 Trial Tr. 692:17–18, 693:1–8 (Valentine's testimony). Owens told them that Hudson was not coming back, that they would not have to deal with him anymore, and that no one was to discuss the matter again. 04/07/2016 Trial Tr.

558:9–10 (Dean's testimony); *id.* 615:24–25, 616:1–4 (Burrus' testimony); 04/08/2016 Trial Tr. 693:9–16 (Valentine's testimony).

Testimony further established that an ABM church meeting was held several weeks later at then-ABM state captain Thomas Parker's trailer; the ABM members who were involved in the Hudson incident were called to the back of Thomas Parker's trailer: Thomas Parker, Owens, Dean, Burrus, Valentine, Eaves, and Creel (and possibly Maxwell and Eric Parker). *Id.* 559:12–17 (Dean's testimony); *id.* 616:5–8 13–17 (Burrus' testimony); 04/08/2016 Trial Tr. 694:15–25, 695:17–20 (Valentine's testimony); 04/08/2016 Trial Tr. 756:4–7 (Creel's testimony). Dean testified that Owens said that the Harrison County Sheriff's Department had questioned him about the kidnapping, but that he had taken care of that. Owens then told them all to keep their mouth shut about the Hudson incident. 04/07/2016 Trial Tr. 559:18–24 (Dean's testimony); *id.* 616:20–23 (Burrus' testimony); 04/08/2016 Trial Tr. 616:21–22 (Valentine's testimony). Some testimony was that Owens said that Eric Parker had talked to authorities about the incident and that Parker and Creel should be killed next. 04/08/2016 Trial Tr. 696:7–10 16–19 (Valentine's testimony); 04/11/2016 Trial Tr. 803:18–25, 804:1–2 (Thomas Parker's testimony). Creel testified that at the meeting he decommissioned all ABM members who were involved in the situation and told them never to speak of the incident again. 04/08/2016 Trial Tr. 756:9–18; *see also* 04/06/2016 Trial Tr. 318:23–25, 319:1–3 (Mask's testimony referring to the killing of Hudson as ABM business).

Based on all of the foregoing, overwhelming evidence supported the jury's verdict against Parker and Owens for the murder of Hudson in aid of racketeering.

### 5. *Attempted Murder in Aid of Racketeering (Owens)*

Finally, the jury found Owens guilty on Count 7 for the attempted murder of Jeremy Bailey in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(5) and (2), which was also a racketeering act of the ABM charged in the superseding indictment.

Title 18 U.S.C. § 1959 provides in pertinent part: "Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, . . . murders . . . any individual in violation of the laws of any State or the United States, or attempts . . . to do so [is guilty of attempted murder in aid of racketeering]."

The superseding indictment charged that the stabbing of Jeremy Bailey (sometimes referred to as "J.B.") constituted attempted murder under Mississippi law. *See* Superseding Indictment [203] ¶ 21. Under Mississippi law, an attempted murder conviction requires a showing of three elements: "(1) an attempt to commit a particular crime, (2) a direct ineffectual act done toward its commission[,] and (3) the failure to consummate its commission." *McGowan v. State*, 541 So. 2d 1027, 1030 (Miss. 1989) (citing Miss. Code. Ann. § 97-1-7)).

Thus, to establish Owens' guilt for Attempted Murder in Aid of Racketeering, the Government had to show five elements: (1) that the ABM was a RICO enterprise; (2) that the ABM was engaged in racketeering activity; (3) that Owens had a position in the ABM; (4) that Owens committed the attempted murder of Bailey in violation of Mississippi law; and (5) that Owens' general purpose in doing so was to maintain or increase his position in the ABM. For the reasons discussed *supra* regarding the RICO conspiracy charges, the first three elements were met. Therefore, the Court proceeds directly to analyzing the last two elements.

Testimony established that at the time of the Bailey incident charged, Owens, Baron Goff, and Perry Mask were the three ABM wheel members/spokes. The three wheels voted to

order a kill-on-sight against Bailey for violations, but later voted to reduce the order to a smash-on-sight. 04/05/2016 Trial Tr. 96:14–25, 98:22–24, 99:7, 100:5–10 (Hubanks' testimony); 04/06/2016 Trial Tr. 248:19–25, 249:1–7 (Mask's testimony). Testimony further established that Owens unilaterally elevated the order to a kill-on-sight, specifically ordering the stabbing of Bailey by ABM member Ricky Jenkins. 04/05/2016 Trial Tr. 100:12–13, 101:2 (Hubanks' testimony); 04/06/2016 Trial Tr. 249:19–25, 250:1–5 9–12 (Mask's testimony).

Unequivocal evidence demonstrated that Jenkins, Owens, and Bailey were housed at Marshall County Correctional Facility, and that Jenkins stabbed Bailey at least five times in the back, based on Owens' instructions to do so. 04/06/2016 Trial Tr. 250:19–22, 252:17–18 (Mask's testimony); *id.* 334:23–25, 335:17–18, 336:4–8, 339:17–21 (Bailey's testimony). Some testimony supported that Owens improperly elevated the order to a kill-on-sight; however, as a result of stabbing Bailey, Jenkins attained ABM thunder warrior status, signified by a lightning bolts tattoo on his neck. 04/05/2016 Trial Tr. 102:6–22 (Hubanks' testimony), *see* 04/06/2016 Trial Tr. 253:2–7 (Mask's testimony). Perry Mask and former ABM treasurer Terry Kelly testified that Owens wanted Jenkins to be further rewarded for stabbing Bailey by receiving $50 a month from the treasury. *Id.* 252:19–25, 253:1 (Mask's testimony); *id.* 391:7–21 (Kelly's testimony). Then-ABM treasurer Kelly testified that he honored that request at least once. *See id.* 402:1–8 (Kelly's testimony). Bailey himself testified that he felt that the stabbing was due to altercations he had had with Owens <u>and</u> Mask and that the order came from wheels Owens and Mask. *Id.* 341:18–23, 347:10–11.

Based on all of the foregoing, overwhelming evidence supported the jury's verdict against Owens for the attempted murder of Bailey in aid of racketeering.

### 6. Conclusion—Sufficiency of the Evidence

After viewing the evidence in the light most favorable to the jury verdicts, the Court concludes that the jury could have found that the Government showed beyond a reasonable doubt the essential elements of all counts of which Parker and Owens were found guilty. Thus, neither Parker nor Owens is entitled to a new trial or a judgment of acquittal based on their challenges to the sufficiency of the evidence.

### B. Venue (Parker)

The Court next addresses Parker's principal and detailed argument that venue was improper in the Northern District of Mississippi because "no agreement was formed in the Northern District of Mississippi between [Parker] and anyone at all, and no overt act occurred by [Parker], or anyone that he had an agreement with, in the Northern District of Mississippi" and "[n]o evidence was submitted that any of the alleged criminal acts by Mr. Parker were committed in the Northern District or done in further[ance] of a conspiracy." *See* Parker's Mot. J. Acquittal [557] ¶ 6. Parker's position is that "[n]o proof was ever put forth that any criminal activity by Parker was Aryan Brotherhood[-]related." Parker cites to the testimony of Perry Mask and Stephen Hubanks that they did not personally know Parker and that the crimes they were orchestrating in the Northern District had nothing to do with Parker. Parker further cites to the testimony of Mask that the monies he received from his crimes were not used to further the ABM, as well as to the testimony of Brandon Creel that Parker's meth business had nothing to do with the ABM. Finally, Parker maintains that the only proof involving crimes in the Northern District of Mississippi began in late 2012.

The Government argues in response that the prosecution of Counts 1 and 2 are continuing offenses that may be brought in any district in which the offenses were begun, continued, or

completed. The Government maintains that although proof of an overt act is not required to convict Parker of a RICO conspiracy, the Government alleged thirty-one overt acts committed in furtherance of the conspiracy, some of which were alleged to have been committed in the Northern District of Mississippi and were proven at trial to have been committed in the Northern District of Mississippi. The Government asserts that because it offered evidence that Parker's co-conspirators committed numerous overt acts in the Northern District of Mississippi, venue is proper, despite that Parker may have never committed an overt act in the Northern District of Mississippi. The Government lists as some of these overt acts occurring in the Northern District of Mississippi the following: the attempted murder of Jeremy Bailey; numerous acts of meth trafficking; the burglary of the Pawn Shop and Barry's Trading Post; and every phone call made from inside the Mississippi State Prison facilities in Parchman, Marshall County, and Alcorn County, among others. All of the three facilities are located within the Northern District of Mississippi.

The Government further argues that venue is proper for the VICAR murder charged in Count 4 because the existence of an enterprise is an essential element of a Section 1959 offense; the ABM constituted the enterprise; and the Government proved at trial that Parker aided and abetted in the murder of Hudson for the purpose of gaining entrance to, maintaining, or increasing his position in the ABM. Thus, the Government maintains, this prosecution was properly brought in the Northern District of Mississippi, a district in which the enterprise conducted its affairs. The Government argues that the principles of venue, as they relate to conspiracy, also apply to aiding and abetting, which may be tried in the district where the principal committed the substantive crimes. The Government further argues that it was unnecessary to prove that Parker committed an overt act in the Northern District of Mississippi

related to the murder of Hudson, but that Parker's involvement in the murder was for the purpose of gaining entrance to, maintaining, or increasing his position in the ABM, and that the ABM's criminal activities stretched into the Northern District of Mississippi. The Government maintains that the murder of Hudson was a direct result of him refusing an ABM order to engage in minutes (a fistfight) with Parker, and that Owens and Parker carried out the murder as ranking ABM members. Accordingly, the Government maintains that because the murder was directly related to Parker's membership and rank in the ABM and because the ABM's criminal activities spanned the entire State of Mississippi, the Court had proper venue over the murder charged in Count 4.

The Court notes that Parker raised these venue arguments in a pretrial motion to dismiss which was later renewed at trial. The Court does not take lightly a challenge to venue, as "the venue right . . . is . . . borne of fundamental notions of fairness as conceived by our Constitution's framers." *See United States v. Stratton*, 649 F.2d 1066, 1079 (5th Cir. 1981). However, upon careful reconsideration of the issue, the Court finds, again, that venue was proper in the Northern District of Mississippi.

As this Court stated in both its memorandum opinion and bench opinion denying Parker's earlier motions concerning venue, the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. Rule 18 of the Federal Rules of Criminal Procedure provides:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18. However, 18 U.S.C. § 3237(a) provides:

> Except as otherwise expressly provided by an enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

"The burden of proof to establish venue is not as onerous as the burden required for proof of an element of a crime." *United States v. Martino*, 648 F.2d 367, 400 (5th Cir.), *aff'd sub nom. Russello v. United States*, 464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983). A defendant may be convicted despite a challenge to venue "if, viewing the evidence in the light most favorable to the Government, a rational jury could find that the Government established venue by a preponderance of the evidence." *United States v. Ramirez*, 555 F. App'x 315, 318 (5th Cir. 2014) (per curiam) (citing *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009)). "[P]reponderance of the evidence . . . can be entirely circumstantial." *United States v. Gonzalez*, 236 F. App'x 962, 964 (5th Cir. 2007) (per curiam) (citing *United States v. Solis*, 299 F.3d 420, 444–45 (5th Cir. 2002)). Thus, "there need not be direct proof of venue where circumstantial evidence in the record as a whole supports the inference that the crime was committed in the district where venue was laid." *United States v. Turner*, 586 F.2d 395, 397 (5th Cir. 1978), *cert. denied*, 440 U.S. 926, 99 S. Ct. 1258, 59 L. Ed. 2d 480 (1979). "If the Government shows by a preponderance of the evidence that the crime was committed in the trial district, both territorial jurisdiction and proper venue are established." *United States v. White*, 611 F.2d 531, 535 (5th Cir. 1980).

The superseding indictment charges Parker in Counts 1, 2, and 4. Count 1 charges Parker, Owens, and others with conspiracy to participate in racketeering activity in violation of 18 U.S.C. § 1962(d) as part of the ABM, "a criminal organization whose members and associates engaged in narcotics distribution, firearms trafficking, money laundering, and acts of violence

involving murder, attempted murder, assault, and kidnapping, and which operated throughout Mississippi, including the Northern District of Mississippi and elsewhere." Superseding Indictment [203] ¶ 3. Specifically, Parker and others are charged as "h[olding] a leadership rank . . . in the ABM enterprise and direct[ing] subordinate members and associates of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs" and "participat[ing] directly in the criminal activities of the ABM enterprise," including the "criminal activities of murder, attempted murder, kidnapping, assault, drug distribution, and firearms trafficking." *Id.* ¶ 4.

As part of the overt acts, Parker was charged with conspiracy to possess with intent to distribute meth in violation of 21 U.S.C. § 846 "in the Northern District of Mississippi and elsewhere" in Count 2, *id.* ¶ 9; and aiding and abetting in the murder of Michael Hudson in violation of 18 U.S.C. § 1959(a)(1) and (2) in Count 4, *id.* ¶ 14.

" '[V]enue in conspiracy cases is proper in any district where the agreement was formed or where <u>an overt act</u> in furtherance of the conspiracy was performed.' " *Gonzalez*, 236 F. App'x at 964 (quoting *United States v. Pomranz*, 43 F.3d 156, 158–59 (5th Cir. 1995) (emphasis added)); *Ramirez*, 555 F. App'x at 318.

In *Ramirez*, the Fifth Circuit stated:

> Here, although many acts in the conspiracies occurred in Dallas, which is in the Northern District of Texas, there was also evidence of significant acts occurring within the Eastern District of Texas, especially in and around Lufkin. The evidence showed that two individuals involved in the conspiracy, Melesio Noyola and Jonathan Beltran, lived in Lufkin, where multiple-kilogram shipments of cocaine were delivered. Some of the cocaine was then further distributed to Louisiana. Money was also delivered to and sent from Lufkin. These acts were all in furtherance of the conspiracies and supported venue in the Eastern District of Texas. The evidence also supported a conclusion that Ramirez and others traveled through the Eastern District of Texas in furtherance of the conspiracy as they distributed cocaine and transported drug proceeds.

*Id.* at 319. In *Gonzalez*, the Fifth Circuit reasoned that venue was proper because "the jury could reasonably have found a conspiracy . . . existed at the time of the conduct in" the particular district. *Gonzalez*, 236 F. App'x at 964.

Similarly, in the case sub judice, the evidence at trial showed that at least the overt act of conspiracy to possess with intent to distribute meth occurred in part in the Northern District of Mississippi, even if the kidnapping and murder of Hudson occurred in the Southern District of Mississippi. The jury reasonably found that the RICO conspiracy existed at the time of the conduct in the Northern District of Mississippi, particularly the meth trafficking, which by the nature of the crime was transient, but at least occurred in part in the Northern District of Mississippi. *See, e.g., United States v. Gray*, 626 F.2d 494 (5th Cir.), *cert. denied*, 449 U.S. 1038, 101 S. Ct. 616, 66 L. Ed. 2d 500 (1980) (although referencing a different crime, transportation of controlled substance in violation of 21 U.S.C. § 952(a) was found to be a " 'continuous crime' . . . not complete until the controlled substance reaches its final destination point" and "venue [was] proper in any district along the way").

Furthermore, the VICAR murder charge in Count 4 pursuant to 18 U.S.C. §§ 1959(a)(1) and (2) was "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." Although the Fifth Circuit has not addressed the venue issue in the context of VICAR murder case, the Fifth Circuit has stated that "[a]iding and abetting crimes may be tried in the district where the principal committed the substantive crimes." *See United States v. Winship*, 724 F.2d 1116, 1124–1125 (5th Cir. 1984). The Second Circuit has stated: "[T]he furtherance of one's position in a racketeering enterprise is precisely what brings otherwise unrelated acts within the purview of a § 1959 prosecution. . . . Unlike criminal laws that proscribe isolated acts of violence (local actions in the common law), § 1959 is aimed at

those kinds of violent crimes committed as part and parcel of membership in a RICO enterprise." *United States v. Saavedra*, 223 F.3d 85, 91 (2d Cir. 2000). "[Murders] contemplated by § 1959 are not single acts, but those that occur as part of the activities of the criminal enterprise." *Id.* Given this reasoning, as well as the detailed account *supra* of the trial testimony as it relates to these counts, venue lies in the Northern District, where at least part of the activities of the criminal enterprise were ongoing.

Therefore, Parker could have been properly tried and convicted in either the Northern District or the Southern District of Mississippi. *See United States v. Nieto*, 721 F.3d 357, 369 (5th Cir. 2013) (challenge that venue was improper because the drug purchases occurred in another district was not well taken because conspiracy was centered in the district where defendants were charged and convicted); *Garcia Mendoza*, 587 F.3d at 686, 687 ("Venue can be based on evidence of any single act that initiated, perpetuated, or completed the crime"; regularly transporting contraband through a district "would support venue, for one co-conspirator's travel through a judicial district in furtherance of the crime alleged establishes venue as to all co-conspirators"); *United States v. Davis*, 666 F.2d 195, 199 (5th Cir. 1982) ("Conspiracy, possession with intent to distribute methaqualone[,] and traveling in interstate commerce to carry on an unlawful business enterprise involving possession with intent to distribute methaqualone are continuing offenses which under 18 U.S.C. § 3237 may be tried in any district in which the crime took place."); *United States v. Cooper*, 606 F.2d 96, 97 (5th Cir. 1979), *cert. denied*, 444 U.S. 1024, 100 S. Ct. 685, 62 L. Ed. 2d 657 (1980) ("A conspiracy may be 'committed' in the constitutional sense in a number of places, particularly when it continues over a period of time and is pursued by overt acts in a number of places.").

Because the Government showed by a preponderance of the evidence that the RICO conspiracy charged in the superseding indictment was a continuing offense that took place, in part, in the Northern District of Mississippi, venue properly lay in the Northern District of Mississippi and Parker was properly tried in the Northern District of Mississippi. Thus, Parker's arguments with respect to venue are not well taken.

## C. Renewal of Pretrial Motions (Parker)

The Court now turns to Parker's arguments that the Court erred in denying his pretrial motions and arguments, specifically his pretrial motions for severance [345] and for an expedited psychological evaluation [453 & 455].

The Court addressed the severance issue at length in its September 9, 2015 Order [373] and memorandum opinion [374] denying the motion for severance [345]. Parker has provided no argument or reasoning to support the renewal of his motion for severance. To avoid repetition, the Court hereby incorporates the reasoning in its Order [373] and memorandum opinion [374]. Severance was not proper in this case. Accordingly, Parker's motion for severance [345] was properly denied.

With respect to Parker's pretrial motions for an expedited psychological evaluation [453 & 455], Parker has provided no argument or reasoning in support of the renewal of his psychological evaluation motions, aside from the statement that he was unable to prepare adequately for trial. At the time the pretrial psychological evaluation motions were filed, the Court held a hearing and determined after due consideration that a psychological evaluation was not warranted under the circumstances, particularly since nothing in the record or at the hearing demonstrated that Parker had an inability to understand or meaningfully participate in the proceedings against him. Accordingly, on March 10, 2016, the Court entered an Order [495] and

memorandum opinion [496] denying the motions. To avoid repetition on this issue, the Court hereby incorporates the reasoning in its Order [495] and memorandum opinion [496] denying Parker's motions for expedited psychological evaluation. The Court notes that the indictment was originally filed on October 23, 2014; this cause was originally set for trial on January 12, 2015; and the Court granted no less than five continuances to allow the parties and counsel to adequately prepare for trial. The first mention of psychological problems occurred on the eve of trial on February 23, 2016. The representation of Joshua A. Turner, Esq. commenced on June 22, 2015, when he was appointed to represent Parker. Accordingly, the Court finds that Parker's motions for expedited psychological evaluation [453 & 455] were properly denied.

### D. Evidentiary Challenges (Parker and Owens)

The Court next addresses Parker's and Owens' evidentiary challenges.

#### 1. Admission of Co-conspirator Statements

Both Parker and Owens contend that the Court "erred by allowing in copious amounts of hearsay statements by alleged co-conspirators that had absolutely nothing to do with the allegations" against them. *See* Parker's Mot. J. Acquittal [557] ¶ 14; Owens' Mot. J. Acquittal [558] ¶ 10. Parker additionally argues, as an issue of first impression, that "[t]he massive amount of hearsay testimony allowed by the trial court was error," in light of *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), which Parker argues effectively abrogated *Ohio v. Roberts*, 448 US. 56 (1980)—upon which *Bourjaily v. United States*, 483 U.S. 181 (1978) relied. The Court notes that neither Parker nor Owens refers to any specific testimony, but instead makes blanket statements concerning the testimony in general.

The Court allowed several witnesses to testify regarding others' out-of-court statements, including the conversations between Maxwell and Dean while riding in an automobile, and

Burrus and Valentine while riding in an automobile, among others. The Court allowed this testimony, reasoning that they were co-conspirator statements admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. To admit evidence under Rule 801(d)(2)(E), "[t]he [G]overnment must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005); *see Lutwak v. United States*, 344 U.S. 604, 617, 73 S. Ct. 481, 97 L. Ed. 593 (1953) ("Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statement of a party."). The Court "may consider the co-conspirator statements in determining whether the prosecution has met its burden." *See United States v. Ruiz*, 987 F.2d 243, 246–47 (5th Cir. 1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)).

In the case sub judice, at the close of the Government's case, the Court made the following findings with respect to the existence of a conspiracy:

> The Court finds, by a preponderance of the evidence, [1] that a conspiracy existed of which both the declarant and the defendants in this case were members; [2] that the declarants made the statements in the course of that conspiracy; and [3] that the declarants made the statement[s] in furtherance of the conspiracy . . . . [T]here were so many co-defendants who testified as to actual knowledge that the hearsay statements were at a very minimum in this case. Most of these people testified as to their personal observations.

04/11/2016 Trial Tr. 950:13–22. The Court finds, upon reconsideration of the issue, that the co-conspirators' statements were properly admitted against Parker and Owens. Specifically, based on the reasoning *supra* concerning the proof of RICO conspiracy, the Government presented

ample evidence to establish both the conspiracy and Parker's and Owens' participation in the conspiracy, and that the statements in question were made in the course of and in furtherance of the conspiracy. Thus, the statements were properly admitted under Rule 801(d)(2)(E).

With respect to Parker's arguments concerning *Crawford v. Washington*, 541 U.S. 36, 53–55, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) and the Confrontation Clause, the Court finds that the same are not well taken. The Fifth Circuit has stated: "The Supreme Court's Confrontation Clause jurisprudence was changed significantly when the Court decided in *Crawford v. Washington* that testimonial statements from an unavailable witness may not be introduced at trial without a prior opportunity for cross-examination, irrespective of any exceptions for hearsay." *Woodfox v. Cain*, 609 F.3d 774, 799 (5th Cir. 2010) (citation omitted; emphasis added). According to *Crawford*, " 'the Confrontation Clause prohibits the admission of an out-of-court testimonial statement unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.' " *United States v. Bedoy*, 827 F.3d 495, 511 (5th Cir. 2016) (quoting *United States v. Pryor*, 483 F.3d 309, 312 (5th Cir. 2007) (citing *Crawford*, 541 U.S. at 59)). However, the Confrontation Clause bars only testimonial statements. *United States v. Tolliver*, 400 F. App'x 823, 830 (5th Cir. 2010) (per curiam) (citing *Crawford*, 541 U.S. at 68, 124 S. Ct. 1354; *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005)). The statements in question were "made casually to a partner-in-crime" and thus were not "testimonial" under the Confrontation Clause. *See id.* The United States Supreme Court stated in *Crawford*: "A person who makes a casual remark to an acquaintance" does not "bear [  ] testimony." 541 U.S. at 51, 124 S. Ct. 1354. Because non-testimonial statements are governed by the Federal Rules of Evidence, and the Federal Rules of Evidence allow a hearsay exception

for co-conspirator's statements, the statements at issue were properly admitted in the trial. *See Crawford*, 541 U.S. at 68, 124 S. Ct. 1354.

## 2. *Admission of Government's Evidence*

Next, Parker and Owens contend that the Court erred by the following: (1) admitting all exhibits involving meth, specifically Government Exhibits 32 through 39; (2) allowing the testimony of Clay McCombs, Chris Goodman, David Bevis, Jay Hoppenwasser, Claire Carly Putt, and Scott Hardy; (3) admitting all exhibits involving a firearm, specifically Government Exhibit 31; (4) allowing testimony of the car chase of William "CC" Carroll and the recovery of meth by the Mississippi Highway Patrol; (5) admitting all audio recordings; and (6) allowing the Government to take photographs of Parker and Owens and submit to the jury. Parker and Owens argue that the exhibits and testimony were more prejudicial than probative and were not relevant to them. Owens additionally argues that no chain of custody was proved by the Government for the meth exhibits. Parker additionally argues that the Court erred by allowing testimony of Perry Mask, Stephen Hubanks, and Natasha Ellis and in admitting Government Exhibits 22 through 24 of David Willis' residence. Finally, Parker and Owens argue that the photographs of them were improperly submitted to the jury, as there was no proof of criminal activity associated with them.

The Government argues in response that this evidence and testimony of ABM's criminal enterprise and its pattern of racketeering activity were properly admitted in support of the RICO conspiracy charge against each defendant. The Government further argues that the Court properly determined that the evidence was admissible pursuant to the Rule 403 balancing test.

The Court finds that the Government's arguments are well taken. The evidence was properly admitted, as in conducting the Rule 403 balancing test, the Court properly determined its "probative value [was not] substantially outweighed by a danger of unfair prejudice,

45

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. As detailed *supra* in the discussion pertaining to both RICO conspiracy (against Parker and Owens) and meth trafficking (against Parker), the evidence pertaining to meth supported both of those charges and the racketeering activity of the ABM charged in the superseding indictment. With respect to Owens' argument concerning chain of custody and the meth exhibits, the Court finds that the exhibits were properly admitted. When Owens challenged the admission of this evidence at trial, the Government made the requisite prima facie showing of authenticity. *See* 04/07/2016 Trial Tr. 37:5–17. *See also United States v. Barela*, 294 F. App'x 857, 858 (5th Cir. 2008) (per curiam) (citing *United States v. Sparks*, 2 F.3d 574, 582 (5th Cir. 1993)). Accordingly, the meth exhibits were properly admitted. The exhibits involving firearms generally supported the broad RICO conspiracy charge against both defendants, being evidence of racketeering activity charged in the superseding indictment. The audio recordings supported all counts charged. The photographs, including those of Parker, Owens, and Willis' residence, were relevant for background on the charges and identification of ABM members.

Furthermore, the Court incorporates herein by reference its April 1, 2016 Order [531] and memorandum opinion [533] granting the Government's pretrial motion in limine [514] to have photographs taken of Parkers' and Owens' tattoos signifying membership in the ABM. In that Order and memorandum opinion, the Court ruled the photographs were admissible to show membership in the ABM, but were not admissible as evidence of prior bad acts or crimes other than those charged in the superseding indictment [203].

For all of the foregoing reasons, the Court finds the evidentiary objections of both defendants are not well taken; the evidence was properly admitted pursuant to Rule 403.

## E. Other Matters

Finally, the Court addresses the remaining issues raised by Parker's and Owens' motions.

First, Parker argues the Court erred by not granting his proposed instructions, specifically, D13 and D27. In the jury instruction conference in the case sub judice, the Court refused D13, Parker's proposed venue instruction, finding it was duplicative of the Government's venue instruction, G33, which was accepted. The Court also rejected D27, finding it was duplicative of the Government's instructions G48 and G49. 04/12/2016 Trial Tr. 53–54. The Court finds, upon reconsideration of the issues, that D13 and D27 were properly refused as duplicative of other instructions.

Second, Parker and Owens argue that the Court erred by denying their motions for mistrial; both contend that mistrial was proper because "the Government continued to claim that [Hudson] was murdered without proof of [Hudson's] death." *See* Parker's Mot. [557] ¶ 16; Owens' Mot. [558] ¶ 11. Based on the evidence and reasoning in the murder of Michael Hudson section *supra*, the Court finds that this argument is not well taken.

Finally, both Parker and Owens renew all motions, objections to evidence, motions, and jury instructions made pretrial, during trial, and during the jury instruction conference. The Court finds that these motions were properly denied.

## IV. Conclusion

Defendants Eric Glenn Parker and Frank George Owens, Jr. have shown neither that the jury's guilty verdicts were unsupported by the evidence nor that the trial was afflicted by error affecting their substantial rights. Accordingly, these defendants are not entitled to a judgment of acquittal, nor does the interest of justice require that the Court grant them a new trial. Thus, the motion for reconsideration of request for acquittal, or alternatively, motion for new trial [557]

filed by Defendant Eric Glenn Parker and the motion for reconsideration of request for acquittal, or alternatively, motion for new trial [558] filed by Defendant Frank George Owens, Jr. are DENIED.

A separate order in accordance with this opinion shall issue this day.

THIS, the ____ day of October, 2016.

_____
SENIOR U.S. DISTRICT JUDGE